IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE: WIRELESS TELEPHONE RADIO | : | MDL No. 1421 |
| FREQUENCY EMISSIONS PRODUCTS | : | CIVIL NO. 01-MD-1421 |
| LIABILITY LITIGATION | : | |
| ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ | : | |
| THIS DOCUMENT RELATES TO: | : | |
| *Pinney, et al. v. Nokia, Inc., et al.* (D.Md.) | : | *Civil No. CCB-01-1456* |
| *Farina v. Nokia, Inc., et al.* (E.D. Pa.) | : | *Civil No. CCB-01-3261* |
| *Gilliam, et al. v. Nokia, Inc., et al.* (S.D.N.Y.) | : | *Civil No. CCB-01-3260* |
| *Gimpelson v. Nokia, Inc., et al.* (N.D. Ga.) | : | *Civil No. CCB-01-3899* |
| *Naquin, et al. v. Nokia, Inc., et al.* (E.D. La.) | : | *Civil No. CCB-01-3259* |

...o0o...

**MEMORANDUM**

On June 21, 2002, the consolidated and renewed motion for remand filed by the plaintiffs in this multidistrict litigation was denied.[1] Because the plaintiffs' claims amounted to a disguised attack on the validity and sufficiency of federal safety regulations regarding cell phones, I found that federal question jurisdiction supported removal. The defendants then filed their consolidated motion to dismiss the plaintiffs' complaints under several theories of preemption. The motion has been fully briefed and argued and for the reasons set forth below, will be granted as to the complaints in Pinney, Farina, Gilliam, Gimpelson, and Naquin.[2]

As in the court's earlier opinion, it is necessary to analyze the plaintiffs' claims before determining whether those claims are preempted. Amended complaints were filed after the defendants

---

[1] That opinion is incorporated herein by reference, to the extent relevant. In re: Wireless Tel. Radio Frequency Emissions Prod. Liab. Litig., 216 F. Supp. 2d 474 (D. Md. 2002) (hereinafter "In re: Wireless").

[2] Since the preemption argument is dispositive of the defendants' motion to dismiss, other defenses raised in the papers will not be considered in this opinion. The issues of remand and preemption as to the complaint in Brower will be resolved in a separate opinion.

filed their motions to dismiss. In Pinney, as amended, the named adult plaintiffs allege that they bought "WHHPs" (wireless handheld telephones) manufactured by Motorola and Nokia and sold without a headset. (Pinney Am. Compl. at ¶¶ 12-14.)[3] One of the adult plaintiffs bought the WHHP for primary use by her minor child. (Id. at ¶ 14.) They seek to represent past and future purchasers and lessees of WHHPs who were not furnished a headset when they acquired the WHHP and who "have not been diagnosed with a brain related tumor or cancer of the eye," the diseases purportedly caused by the radiofrequency ("RF") radiation ("RFR") emanating from cell phone antennas. (Id. at ¶ 45.)[4] They

---

[3] The definition of WHHP has been amended to refer only to "those that are designed and manufactured so as to readily allow for the use of a headset in conjunction with the WHHP." (Pinney Am. Compl. at ¶ 1.) WHHPs are also referred to as "cell phones" in this opinion.

[4] Specifically, the proposed classes are defined as:

   a.   All purchasers or lessees of WHHPs who are residents of the State of Maryland, and who were residents of the State of Maryland when they purchased or leased a WHHP, who have not been diagnosed with a brain related tumor or cancer of the eye and who were not furnished a headset at the time they purchased or leased their WHHP;

   b.   All future purchasers of WHHPs who are residents of the State of Maryland and who have not been diagnosed with a brain related tumor or cancer of the eye; and

   c.   All purchasers or lessees of WHHPs who have purchased or leased WHHPs for use primarily by their minor children who are residents of the State of Maryland, and who were residents of the State of Maryland when they purchased or leased a WHHP, whose minor children have not been diagnosed with a brain related tumor or cancer of the eye and who were not furnished a headset at the time they purchased or leased their WHHP.

(Id. at ¶ 45.)

claim that the defendants: failed to warn consumers about the possible adverse health risks associated with RFR emissions from cell phones and failed to explain that use of headsets could greatly reduce those risks, thus making the WHHPs defective and unreasonably dangerous (Count I - Strict Product Liability - Failure to Warn); violated the Maryland Consumer Protection Act by making false statements or omissions of material fact concerning the adverse health risks of RFR and the reduction in risk obtained by the use of headsets (Count II - Violation of Maryland Consumer Protection Act); breached implied warranties of merchantability by selling WHHPs without a headset (Count III - Breach of Implied Warranties); committed fraud by concealing evidence that WHHPs "are not safe for use" and intentionally failing to warn of health risks from RFR (Count IV - Fraud by Concealment); conspired to market unreasonably dangerous and defective WHHPs by, inter alia, "thwart[ing] efforts to regulate and control RFR emissions of WHHPs" and defrauding the plaintiffs "into believing WHHPs are safe without the use of a headset" (Count V - Civil Conspiracy); committed civil battery by intentionally exposing the plaintiffs to RFR, causing biological injury (Count VI - Civil Battery); and negligently misrepresented that WHHPs are safe (Count VII - Negligent Misrepresentation).

The relief requested for each of these claims is identical. Compensatory damages are sought to purchase a headset for each class member or reimburse those who have already done so. Each class member who does not have one is to be provided a WHHP that can be used with a headset.[5] Further, each class member is to be provided "instructions for the use of a headset, as well as reasons why a headset should be used." (Id. at Ad Damnum.) The plaintiffs also seek punitive damages and

---

[5] This seems somewhat inconsistent with the definition of WHHP stated in paragraph 1 of the Amended Complaint.

attorneys' fees.[6]

In Gimpelson, the plaintiffs seek to represent a class of Georgia residents like the Pinney class but do not separately identify a class of minor children. The claims are identical to those in Pinney except for the absence of a statutory consumer protection act claim. In Farina, the plaintiffs allege similar causes of action on behalf of a class of Pennsylvania residents, including a specific claim for declaratory relief "requiring defendants to supply WHHP users with headsets . . . together with appropriate instructions . . . " (Farina Am. Compl. at ¶ 150.) In Gilliam, the plaintiffs identify classes consisting of adults and minors who are New York residents and they assert claims similar to those in Pinney and Farina.

Plaintiffs in the Naquin case bring claims for Louisiana residents and state them somewhat differently, although the central theme is identical: WHHPs without headsets are defective. (See Naquin Am. Compl. at ¶¶ VIII and XLV.) Among the claims asserted are violations of federal law, specifically the Magnuson-Moss Warranty Improvement Act, 15 U.S.C. §§ 2301, et seq., and Louisiana state law of redhibition.[7] The relief sought is the same as that requested in Pinney, Gimpelson, Farina, and

---

[6] The amended complaint deletes the request for injunctive relief preventing the sale of WHHPs without headsets.

[7] The Louisiana Civil Code explains that a product defect is redhibitory "when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale. A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price." LA. CIV. CODE ANN. art. 2520 (West 2003).

4

Gilliam.[8]

The comprehensive federal regulatory scheme governing the licensing and RF emissions of cell phones was discussed in the court's earlier opinion and need not be repeated here. See In re: Wireless Tel. Radio Frequency Emissions Prod. Liab. Litig., 216 F. Supp. 2d 474, 483-88 (D. Md. 2002) (hereinafter "In re:Wireless"); see also "Actions that may have a significant environmental effect, for which Environmental Assessments (EAs) must be prepared," 47 C.F.R. § 1.1307 (2003); "Radiofrequency radiation exposure evaluation: mobile devices," 47 C.F.R. § 2.1091 (2003); "Radiofrequency radiation exposure evaluation: portable devices," 47 C.F.R. § 2.1093 (2003); "Equipment authorization," 47 C.F.R. § 24.51 (2003); "RF hazards," 47 C.F.R. § 24.52 (2003). The regulation most pertinent to the present discussion is the RF emissions standard for portable devices, expressed in terms of specific absorption rate ("SAR"). See 47 C.F.R. § 2.1093(d).[9] This standard was set by a Federal Communications Commission ("FCC") regulation after careful consideration of the views of other federal agencies. See In re: Wireless, 216 F. Supp. 2d at 485-87.[10] One such

---

[8] In their amended complaint, the Naquin plaintiffs have deleted: (1) all claims under the Louisiana Unfair Trade Practices Laws for medical monitoring, emotional distress, and pain and suffering; and (2) all claims for any individualized physical injury. (Naquin Am. Compl. at ¶ CXXIX.)

[9] As stated in the court's earlier opinion, "'SAR is a measure of the rate of energy absorption due to exposure to an RF transmitting source.'" 216 F. Supp. 2d at 485, n.7 (quoting 47 C.F.R. § 2.1093(d)). Defendants must comply with the RFR safety requirements in 47 C.F.R. § 2.1093(d) in order to make their phones available to the public.

[10] The regulation was adopted under the authority derived from the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321, et seq. (see also Cellular Phone Taskforce v. FCC, 205 F.3d 82, 87 (2d Cir. 2000)), as well as the Telecommunications Act of 1996, Pub. L. No. 104-104, § 704(b), 110 Stat 56, 152 (1996), which directed the FCC to conclude its already ongoing rulemaking process within 180 days.

agency was the Food and Drug Administration ("FDA"), which has responsibility, under the Electronic Product Radiation Control Act ("EPRCA"), 21 U.S.C. § 360kk, in consultation with other agencies, for setting standards to protect the public health from radiation emitting products.  Under the statute, the FDA has authority to "prescribe performance standards for electronic products to control the emission of electronic product radiation . . . if [it] determines that such standards are necessary for the protection of the public health and safety."  21 U.S.C. § 360kk(a)(1); see also Verb v. Motorola, Inc., 672 N.E.2d 1287, 1293 (Ill. App. Ct. 1996).  Thus, it is apparent that the FCC and the FDA share significant responsibility for the regulation of environmental, health, and safety matters related to WHHPs.  See In re: Wireless, 216 F. Supp. 2d at 485-87 (detailing the inter-agency collaboration between the FCC and the FDA in setting RF exposure standards); see also "In re: Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation," 11 F.C.C.R. 15,123 at ¶¶ 18, 49, 62 (1996) (hereinafter "In re: Guidelines") (same); Press Release, Federal Communications Commission, "FDA-FCC Cellular Phone and Radiofrequency Energy Website Posted for Public Use and Comment" (May 8, 2002) (available at 2002 WL 920836) (hereinafter "Press Release") (describing website, entitled "Cell Phone Facts," jointly established by the FCC and the FDA to provide information regarding cell phones and RF energy).

State law or regulation, which may include the effects of suits under state tort law, may be preempted in several ways by the operation of a federal statute or regulation.  See, e.g., Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 865, 884 (2000).  In each case, the objective or purpose of Congress is of primary concern in determining whether preemption exists.  See, e.g., Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-74 (2000); Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-

86 (1996) (stating that "'the purpose of Congress is the ultimate touchstone' in every pre-emption case" and that such purpose is "revealed not only in the [statute's] text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law") (citations omitted).

State law may be expressly preempted by federal law, but even in the absence of an express provision, the Supreme Court has found that

> state law must yield to a congressional Act in at least two circumstances. When Congress intends federal law to "occupy the field," state law in that area is preempted. And even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute. We will find preemption where it is impossible for a private party to comply with both state and federal law, and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

Crosby, 530 U.S. at 372-73 (citations omitted) (alterations in original); see also City of Charleston v. A Fisherman's Best, Inc., 310 F.3d 155, 169 (4th Cir. 2002). These categories of preemption, of course, are not "'rigidly distinct.'" Crosby, 530 U.S. at 373, n.6 (citation omitted).

The defendants first argue that the plaintiffs' claims are expressly preempted under 47 U.S.C. §§ 332(c)(7) and 332(c)(3). Section 332(c)(7) forbids the states from regulating "the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions," while Section 332(c)(3) forbids states from regulating "the entry of or the rates charged" by any commercial mobile service, but expressly allows states to regulate "the

7

other terms and conditions" of such services.[11]  These provisions, particularly 332(c)(7), present close questions.[12]  Because the defendants' argument for implied conflict preemption is more compelling, however, I need not reach the question of express preemption.  Similarly, it is not necessary to reach the issue of field preemption.  See, e.g., Hillsborough County v. Automated Med. Lab., Inc., 471 U.S. 707, 713-14 (1985) (discussing field preemption analysis).[13]

Several preliminary issues must be discussed before proceeding to the question of implied conflict preemption.  First, the plaintiffs have argued that the court should not reach the issue of preemption, which ultimately depends on an application of the Supremacy Clause, without first resolving all other defenses. The opinion relied upon by the plaintiffs, Bell Atl. Maryland, Inc. v. Prince George's County, 212 F.3d 863 (4th Cir. 2000), is distinguishable, however, because it is not at all clear there is an independent state law ground entirely dispositive of these complaints.  See MediaOne Group, Inc. v. County of Henrico, 257 F.3d 356, 361 (4th Cir. 2001); Bell Atlantic, 212 F.3d at 865-66 (holding that the avoidance rule articulated in Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 341, 346-47 (1936), applies when resolution of state law issues would dispose of the controversy).

---

[11]The plaintiffs' amended complaints seek to undermine the argument that a headset requirement would pose a barrier to entry under Section 332(c)(3) by defining the class as purchasers of WHHPs already equipped for headsets and by deleting the request for an injunction against the sale of WHHPs without headsets.

[12] See In re: Wireless, 216 F. Supp. 2d at 497 (noting that sections 332(c)(7) and 332(c)(3) are "strong express preemption provisions which may be held in state court to bar relief of the sort plaintiffs request").

[13] Any attempt to rely on express or field preemption would, of course, have to contend with the presence of saving clauses in the Telecommunications Act of 1996, the Communications Act of 1934 and the EPRCA.  See 47 U.S.C. §§ 152 (notes), 414; 21 U.S.C. § 360ss.

More importantly, Bell Atlantic preceded the decision in Sprietsma v. Mercury Marine, in which the Supreme Court proceeded directly to decide whether a federal statute preempted state common law tort claims, explaining that "[b]ecause the pre-emption defense raises a threshold issue, we have no occasion to consider the merits of petitioner's claims, or even whether the claims are viable as a matter of Illinois law."  123 S. Ct. 518, 522-23 (2002).[14]

Second, the plaintiffs suggest that the presence of express preemption and saving clauses essentially precludes a finding of implied conflict preemption in this case.[15]  It is important to note Sprietsma's reminder that Congress's inclusion of an express preemption clause "'does not bar the ordinary working of conflict pre-emption principles,' that find implied pre-emption . . . 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  Id. at 527 (citations omitted) (emphasis in original).  Nor does the presence of a saving clause bar a finding of implied preemption, even where that clause is sufficient to preserve a "significant number" of common law tort actions for personal injury.  Geier, 529 U.S. at 868-70.  Further, the

---

[14]  Plaintiffs rely on Sprietsma for other reasons discussed later in this opinion.

[15]  In fact, the plaintiffs cite a House Conference Report for the proposition that the saving clause located in the Telecommunications Act of 1996, 47 U.S.C. § 152 (notes), "prevents affected parties from asserting that the bill impliedly preempts other laws."  H. Conf. Rep. No. 104-458, at 201 (1996).  This comment must be read in context with settled case law.  The Supreme Court "has repeatedly 'decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'"  Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 870 (2000) (quoting United States v. Locke, 529 U.S. 89, 106-07 (2000)).  As explained elsewhere in this opinion, plaintiffs' claims are impliedly preempted because they conflict with the comprehensive federal regulatory scheme governing the RF emissions of cell phones and with the Congressional purposes that led to those regulations.  See also S. Blasting Servs., Inc. v. Wilkes County, 288 F.3d 584, 589 (4th Cir. 2002) (holding that the "Supreme Court has repeatedly held that 'state laws can be pre-empted by federal regulations as well as by federal statutes'" (quoting Hillsborough, 471 U.S. at 713)).

9

combination of express preemption and saving provisions together impose no "special burden" on a party claiming conflict preemption. Id. at 870-71.

Third, the plaintiffs rely on a "presumption" against preemption of private damages remedies in the field of public health and safety, which has been within the "historic police powers of the State." De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 814 (1997) (citing Hillsborough County, 471 U.S. at 715). That presumption is not triggered, however, when the state claim falls in an area "where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108 (2000). Congressional concern for national uniformity of regulation in the field of wireless telecommunications has been clear since the inception of commercial wireless telephone service. In re: Wireless, 216 F. Supp. 2d at 483. Moreover, these lawsuits do not involve a traditional claim of compensation for personal injury. Cf. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 241-42 (1984). Indeed the class definition excludes those who have developed cancer, and the complaints contain no request for personal injury compensation. As a disguised attack on the adequacy of federal safety regulations, see In re: Wireless, 216 F. Supp. 2d at 479, these claims are very similar to the state law "fraud-on-the-agency" claims found impliedly preempted in Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001). As the Court noted in Buckman: "Policing fraud against federal agencies is hardly 'a field which the States have traditionally occupied' . . . To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character . . ." Id. at 347 (citations omitted). Accordingly, there is no presumption against preemption in this case.

Finally, the plaintiffs contend that this court should not consider the defendants' preemption arguments because, prior to transfer of the cases by the Judicial Panel on Multi-District Litigation

("JPML") to this court, Judge Lemelle of the United States District Court for the Eastern District of Louisiana ruled that the Naquin plaintiffs' claims were not preempted. (See Defs.' Mem. in Supp. of their Consolidated Rule 12(b)(6) Mot. to Dismiss Pls.' Compls. as Preempted at Ex. A (Tr. of Mot. Heard in Open Court, 1/17/01) (hereinafter "Mot. Tr."); see also Supp. to Pls.' Mem. in Opp. to Defs.' Consolidated Rule 12(b)(6) Mot. to Dismiss Pls.' Compls. as Preempted at Ex. A (Minute Entry) (hereinafter "Minute Entry").) This earlier ruling is not dispositive of the present motion for several reasons. First, because Judge Lemelle stated explicitly that his order did "not foreclose reconsideration of preemption issues at a subsequent stage of this litigation" (see Minute Entry at 2), and because reconsideration of orders following transfer by the JPML is permitted to ensure consistent pretrial rulings, see, e.g., Degulis v. LXR Biotechnology, Inc., 928 F. Supp. 1301, 1309 (S.D.N.Y. 1996), the earlier preemption order is not binding on this court or dispositive of the present discussion. Second, Judge Lemelle's ruling preceded the establishment of the joint FDA-FCC website, which does not constitute regulation, but does contain a clear expression of the FDA's position on the adequacy of the FCC's SAR standard. Third, while the parties and Judge Lemelle mentioned FCC regulations in passing, the court based its order entirely on the perceived lack of a clear position articulated by the FDA. (Mot. Tr. at 33-38.) Insofar as the court was not asked to consider the numerous FCC regulations or the inter-agency statements regarding RF emissions from cell phones, its conclusion is distinguishable.

The question, then, is whether permitting these lawsuits would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Crosby, 530 U.S. at 372-73. The answer is yes, because the only relief sought would necessarily require a judge and jury

11

to usurp the regulatory function entrusted by Congress to the expertise and discretion of federal agencies.  In addition, "the risk of fifty different states articulating fifty different rules about whether and to what extent they may set RF safety standards," see In re: Wireless, 216 F. Supp. 2d at 491, conflicts with Congress's objectives of achieving national uniformity in wireless telecommunications services and striking a balance between the proliferation of wireless services and the need to protect the public from any harmful effects of RF exposure.  As I will explain further, under these specific circumstances, implied conflict preemption should be applied.[16]

First, Congress has expressed its intent on numerous occasions to achieve substantial national uniformity over the operation and regulation of wireless telecommunications services.  See In re: Wireless, 216 F. Supp. 2d at 483-84, 490-91 (noting Congress's intent that wireless telecommunications services "'operate without regard to state lines'") (citations omitted); see also 47 U.S.C. §§ 151, et seq.; H. Rep. No. 104-204, at 94 (1995), reprinted in 1996 U.S.C.A.N.N. 10, 61 (stating that "it is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety, be established as soon as possible").[17]  Accordingly, Congress has

---

[16] Plaintiffs contend that their actions are not preempted because the FCC refused to establish a federal rule of tort liability in connection with RF exposure, positing that it may "preempt too broad a scope of legal actions."  "In re: Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934," 12 F.C.C.R. 13,494 at ¶¶ 83, 90 (1997) (hereinafter "FCC Second Order").  This argument is not persuasive. After noting that the establishment of such a rule was "beyond the scope of [the] proceeding," id. at ¶ 90, the FCC merely stated (in two sentences) that a rule preempting all state tort suits based on environmental effects of RF emissions may be too broad.  Id. at ¶¶ 83, 90.  I agree.  This opinion holds only that plaintiffs' claims, as a disguised attack on the adequacy of federal regulations, are preempted.

[17] The House Report continues: "Such requirements will ensure an appropriate balance in policy and will speed deployment and the availability of competitive wireless telecommunications services

granted extensive regulatory authority of wireless telecommunications services to the FCC, the FDA, and other federal agencies. See, e.g., In re: Wireless, 216 F. Supp. 2d at 483-87. In particular, the environmental effect of RFR in connection with wireless technology use has been expressly recognized by Congress as an issue for federal regulation. See, e.g., Telecommunications Act of 1996, Pub. L. No. 104-104, § 704(b), 110 Stat 56, 152 (1996) (stating that, "Within 180 days after the enactment of [the Telecommunications Act of 1996], the [FCC] shall complete action in ET Docket 93-62 to prescribe and make effective rules regarding the environmental effects of radio frequency emissions");[18] "In re: Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934," 12 F.C.C.R. 13,494 at ¶ 32 (1997) (hereinafter "FCC Second Order") (urging standard-setting organizations "to work together, along with the relevant federal agencies, to develop consistent, harmonized guidelines that will address the concerns and issues raised in this proceeding"). Indeed, the FCC had undertaken that responsibility even before the specific deadline set by Congress. See In re: Wireless, 216 F. Supp. 2d at 483-87 (explaining that the FCC has asserted "'federal primacy over the areas of technical standards and

---

which ultimately will provide consumers with lower costs as well as with a greater range and options for such services." H. Rep. No. 104-204, at 94 (1995), reprinted in 1996 U.S.C.A.N.N. 10, 61.

[18] Although specifically referring to the express preemption provision contained in section 332(c)(7), the following excerpt from House Report 104-204 reveals Congress's intent to achieve national uniformity over RF emissions standards: "The [Commerce] Committee has received substantial evidence that local zoning decisions, while responsive to local concern about the potential effects of radio frequency emission levels, are at times not supported by scientific and medical evidence. A high quality national wireless telecommunications network cannot exist if each of its component [sic] must meet different RF standards in each community. The Committee believes the [FCC] rulemaking on this issue (ET Docket 93-62) should contain adequate, appropriate and necessary levels of protection to the public, and needs to be completed expeditiously." H. Rep. No. 104-204, at 95 (1995), reprinted in 1996 U.S.C.A.N.N. 10, 61-62.

competitive market structure for cellular service'" since at least 1981 and that it has evaluated the effects of RFR on the environment since 1985) (citations omitted); see also In re: Guidelines at ¶ 6. As stated above, the specific regulation adopted by the FCC limiting SAR for cell phones, 47 C.F.R. § 2.1093(d), reflects the "consensus view" of numerous federal agencies, including the FCC, the FDA, the Environmental Protection Agency, the Occupational Safety and Health Administration, and the National Institute for Occupational Safety and Health, which itself is part of the Centers for Disease Control and Prevention.  See In re: Wireless, 216 F. Supp. 2d at 485-87, n.9-10.

Moreover, the FCC regulations represent a policy decision closely analogous to that described by the Second Circuit in Cellular Phone Taskforce v. FCC, 205 F.3d 82, 91-92 (2d Cir. 2000): that is, a judgment about the amount of safety margins that should be required by regulation in the face of scientific uncertainty about the precise extent of any danger presented by RFR.[19]  According to the FCC, the exposure limit "'is one fiftieth of the point at which RF energy begins to cause any unhealthful thermal effect.'"[20]  In re: Wireless, 216 F. Supp. 2d at 485 (citations omitted); see also FCC Second

---

[19] In Cellular Phone Taskforce, the Second Circuit rejected an appeal from the two FCC final orders that established safety standards for RF emissions.  205 F.3d at 87 (citing, inter alia, FCC Second Order).

[20] Despite plaintiffs' contentions to the contrary, the federal agencies also considered the non-thermal effects of RF exposure when formulating their regulations and opinions.  See Cellular Phone Taskforce, 205 F.3d at 90-91 (explaining that the American National Standards Institute and the National Council on Radiation Protection and Measurements considered non-thermal effects when promulgating their standards, which form the basis of the FCC guidelines); FCC Second Order at ¶¶ 19-39 (reaffirming FCC exposure limits in response to challenges that they did not protect against "non-thermal effects," by stating that the established exposure limits "provide a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address growing marketplace demands"); Brief for the Respondents in Opposition [to Petition for Writ of Certiorari] at 22-23, Cellular Phone Taskforce v. FCC, U.S. Sup. Ct. No. 00-393 (2000) (elaborating on the agencies' consideration of

Order at ¶ 114 (noting that the FCC adopted "more conservative RF exposure guidelines" to comport with Congress's intent that the FCC rules "'contain adequate, appropriate and necessary levels of protection to the public'") (citations omitted).  Although the FCC standard does not keep RF exposure as low as reasonably achievable, the Second Circuit determined that so requiring "would be inconsistent" with the FCC's mandate to "'balance between the need to protect the public . . . and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible.'" Cellular Phone Taskforce, 205 F.3d at 91-92 (citations omitted); see also 47 U.S.C. §§ 151, 157(a) (articulating Congress's objectives of "mak[ing] available . . . a rapid, efficient, nationwide, and world-wide wire and radio communications service" and "encourag[ing] the provision of new technologies and services to the public"); FCC Second Order at ¶ 39 (concluding that the established RF exposure limits "are appropriate because they address [safety] concerns and, at the same time, allow applicants and licensees to meet the growing marketplace demand for communications services").  That policy decision has been supported by the FDA, not only implicitly by its decision not to require any stronger action under 21 U.S.C. § 360kk, but also explicitly by its recent adoption of the joint FDA-FCC website addressing cell phone health and safety.  See "Cell Phone Facts," available at http://www.fda.gov/cellphones/qa.html (hereinafter "Cell Phone

---

the possible non-thermal effects of RF energy and quoting a letter from the EPA stating that, "'The majority of currently available studies suggests . . . that there are no significant non-thermal human health hazards.  It therefore continues to be EPA's view that the FCC exposure guidelines adequately protect the public from all scientifically established harms that may result from RF energy fields generated by FCC licensees'") (citations omitted).

15

Facts").[21]

As stated above, while the website does not, of course, constitute regulatory action, it is an important indication of agency purpose and opinion. Admittedly, the website does identify use of a headset as an option for consumers if they are "concerned about avoiding even potential risks." Id. The same set of questions and answers, however, states that "the existing scientific data do not justify FDA regulatory actions." Id. This is a clear statement of the FDA's position.[22] Further, in discussing hands-free kits and shielding devices, the website explains that "[s]ince there are no known risks from exposure to RF emissions from wireless phones, there is no reason to believe that hands-free kits [or shielding devices] reduce risks."[23] Id. "Wireless phones marketed in the U.S. are required to meet safety requirements regardless of whether they are used against the head or against the body. Either

---

[21] As stated by the FCC on the website, "Our joint efforts with the FDA in developing this website is [sic] illustrative of the kind of inter-agency efforts and consultation we engage in regarding this health and safety issue." See Cell Phone Facts.

[22] The FCC recently reiterated that it shares the FDA's position of refraining from regulating unless and until scientific data supports doing so. In dismissing a recent challenge to the RF safety rules, the FCC emphasized that, "We note that, as with any decision related to the health impact of technologies regulated by the Commission, if medical opinion on the impact of these technologies changes, we will consider whether our rules should be adjusted." "In re: Amendment of Part 15 of the Commission's Rules to Permit Operation of Biomedical Telemetry Devices on VHF TV Channels 7-13 and on UHF TV Channels 14-46," 17 F.C.C.R. 8,948 at ¶ 5 (2002); see also In re: Guidelines at ¶¶ 4, 34 (same); FCC Second Order at ¶ 32 (same); Press Release (stating that "both agencies" (the FCC and the FDA) monitor studies regarding the risks of exposure to RFR and they "will take follow-up action as appropriate"); Cell Phone Facts (stating that "government agencies are continuing to monitor the latest scientific findings to determine whether changes in safety limits are needed to protect human health").

[23] Indeed "shields" may lead to an increase in absorption. Cell Phone Facts (explaining that "so-called 'shields' may interfere with proper operation of the phone . . . [which] may be forced to boost its power to compensate, leading to an increase in RF absorption").

16

configuration should result in compliance with the safety limit." Id.  The website also acknowledges, of course, that there is no proof wireless phones are "absolutely safe."  Id.

As demonstrated, Congress passed legislation, and federal agencies collaborated in regulating RF emissions, guided by the objectives of achieving a nationally uniform wireless telecommunications system and balancing the development of that system with the need to protect the public from any harmful effects of RF exposure.  See, e.g., 47 U.S.C. §§ 151, et seq.; 21 U.S.C. § 360kk; 47 C.F.R. §§ 1.1307, 2.1091, 2.1093, 24.51, 24.52.  The federal agencies refrained, however, from imposing a headset requirement or a stricter SAR standard.  See, e.g., Cellular Telephone Taskforce, 205 F.3d at 90-93; 47 C.F.R. §§ 2.1093, 24.51; "In re: Amendment of Part 15 of the Commission's Rules to Permit Operation of Biomedical Telemetry Devices on VHF TV Channels 7-13 and on UHF TV Channels 14-46," 17 F.C.C.R. 8,948 at ¶ 5 (2002); Cell Phone Facts.  Plaintiffs' complaints essentially request various state courts to impose a headset requirement, the very purpose of which is to reduce the SAR of RF exposure to the head.  (See, e.g., Pinney Am. Compl. at ¶ 64 (alleging that, "Appropriately designed headsets when properly used eliminate the WHHP users' exposure to RFR").)  Such a request conflicts not only with the current SAR standard, 47 C.F.R. § 2.1093, but also with the agencies' deliberate decision to forego a headset requirement.  Accordingly, plaintiffs' state tort lawsuits stand "as an obstacle to the accomplishment and execution of the full purposes and objective of Congress," Crosby, 530 U.S. at 372-73, namely, deference to the expertise of federal agencies, the development of national uniform standards, and the balance between developing a wireless telecommunications system and protecting the public.

The Supreme Court's recent opinion in Sprietsma, relied on by plaintiffs, establishes that an

17

agency's decision not to require a particular safety device does not, in itself, require implied preemption of all state law claims based on the absence of that device. 123 S. Ct. at 527-30. Sprietsma, however, involved a traditional state law claim for personal injury, thus invoking the "important remedial role in compensating accident victims." Id. at 527. The saving clause under consideration in Sprietsma, "Compliance with . . . regulations . . . prescribed under this chapter does not relieve a person from liability at common law or under State law," was found by the Court to have "compensation" as its "manifest object," thus preserving "private damages remedies." Id. at 524, 526-27. The plaintiffs simply do not seek to compensate personal injury in these suits. Despite the fact that the plaintiffs have not alleged any adverse health effects suffered as a result of their use of cell phones, they nonetheless seek to have the responsible federal agencies' judgment overruled in several separate states by an individual judge or jury through compensatory and declaratory relief requiring the provisions of headsets, instructions, and "reasons" the headsets should be used. Such a result is contrary to the Congressional purposes of national uniformity, deference to agencies' expertise, and striking an appropriate balance between wireless telecommunications development and public safety.[24]

---

[24] Sprietsma is distinguishable from this case on other bases, as well. First, Congress authorized the Secretary of Transportation (who delegated this authority to the Coast Guard) to issue regulations establishing "'minimum safety standards'" for recreational boats, see 123 S. Ct. at 523 (quoting 46 U.S.C. § 4302) (emphasis added), thereby explicitly suggesting that federal policy could be augmented by state law. Second, the Sprietsma Court noted repeatedly that propeller-strike injuries are a known risk of boating, 123 S. Ct. at 525, n.8 (citing reports pertaining to the number of propeller injuries and fatalities), whereas there are no proven risks from exposure to RF emissions from cell phones. See, e.g., Cell Phone Facts. Finally, while the Sprietsma Court emphasized that "the Solicitor General, joined by counsel for the Coast Guard, has informed [it] that the agency does not view the 1990 refusal to regulate or any subsequent regulatory actions by the Coast Guard as having any pre-emptive effect," 123 S. Ct. at 529, there has been no such concession in this case.

For the foregoing reasons, I find that implied conflict preemption applies to this case and, therefore, defendants' consolidated motion to dismiss the complaints in <u>Pinney</u>, <u>Farina</u>, <u>Gilliam</u>, <u>Gimpelson</u>, and <u>Naquin</u> will be granted on this basis.

A separate Order follows.

   March 5, 2003                                  /s/
        Date                                        Catherine C. Blake
                                                  United States District Judge